*MADE JS-6*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | EDCV 12-221-GW | Date | July 9, 2012 |
|---|---|---|---|

| Title | *In Re Heather R. Cacciatori* |
|---|---|

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Margaret Babykin | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Kenrick W. Young | Heather R. Cacciatori, pro se |

**PROCEEDINGS:**     **HEARING ON BANKRUPTCY APPEAL**

Court hears oral argument.  The Tentative circulated and attached hereto, is adopted as the Court's final ruling.  The Court affirms the Bankruptcy Court's final judgment in this adversary proceeding.

|  | : | 06 |
|---|---|---|
| Initials of Preparer | JG | |

*First Mut. Sales Fin. v. Cacciatori*, Case No. 5:12CV221 GW
Tentative Ruling on Appeal from Bankruptcy Court's February 15, 2012 Judgment and
Memorandum Decision

      In this appeal from the final judgment of a bankruptcy court in an adversary proceeding[1]
(*see* Appellant's Excerpts of Record ("FM ER"), Tab X), plaintiff/appellant First Mutual Sales
Finance ("First Mutual") challenges the Bankruptcy Court's (1) pre-trial rejection of a proposed
consent judgment and (2) its subsequent determination that First Mutual had not established that
*pro se* defendant/appellee Heather R. Cacciatori's debt to it was non-dischargeable pursuant to
11 U.S.C. § 523(a)(2)(B).  Section 523(a)(2)(B) provides that a discharge pursuant to various
provisions of Title 11 "does not discharge an individual debtor from any debt...for...an
extension...of credit, to the extent obtained by...use of a statement in writing...that is materially
false...respecting the debtor's...financial condition...on which the creditor to whom the debtor
is liable for such...credit reasonably relied...and...that the debtor caused to be made or
published with intent to deceive...."  11 U.S.C. § 523(a)(2)(B).  The Ninth Circuit understands
this provision as requiring:  (1) a representation of fact by the debtor, (2) that was material, (3)
that the debtor knew at the time to be false, (4) that the debtor made with the intention of
deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's reliance was
reasonable, and (7) that damage proximately resulted from the representation.  *See Candland v.
Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1469 (9th Cir. 1996).  In order to render a
debt nondischargeable under section 523(a)(2)(B), a creditor bears the burden to prove these
elements by a preponderance of the evidence.  *See id.*; *La Trattoria, Inc. v. Lansford (In re
Lansford)*, 822 F.2d 902, 904 (9th Cir. 1987).  The Bankruptcy Court determined that First
Mutual had satisfied its burden with respect to elements 1, 2, 5 and 7, but that it had otherwise
failed to satisfy the criteria.

### Standard of Review

      Interpretations of the bankruptcy statute are reviewed de novo, as are conclusions of law
in general.  *See Boyajian v. New Falls Corp. (In re Boyajian)*, 564 F.3d 1088, 1090 (9th Cir.
2009); *Candland*, 90 F.3d at 1469.  Findings of fact are reviewed under a "clearly erroneous"

---

[1] This Court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

standard. *See Candland*, 90 F.3d at 1469 (indicating that findings regarding reliance on false statements, intent to defraud, proximate cause of damages, and materiality are all questions of fact reviewed under the clearly erroneous standard); *Lansford*, 822 F.2d at 904 (indicating that question of reasonable reliance is an issue of fact). A bankruptcy court's decision may be affirmed on any ground finding support in the record. *See Siriani v. Nw. Nat'l Ins. Co. (In re Siriani)*, 967 F.2d 302, 304 (9th Cir. 1992).

### **Factual/Procedural Background**

As the Bankruptcy Court summarized in its Memorandum Decision, on June 8, 2007, Cacciatori met with a sales representative from Clearview Home Improvements ("Clearview"), in connection with the purchase and installation of replacement windows for her home. *See FM ER*, Tab IX, at 2/296.[2] The Clearview sales representative,[3] after informing Cacciatori that the sale could be financed, produced a credit application form from an entity by the name of Viewtech Financial Services, Inc. *See id.*; *see also* FM ER, Tab V, Exh. A. In sum, Cacciatori provided the sales representative with financial information and the sales representative filled out the form. *See FM ER*, Tab IX, at 2/296. Cacciatori reviewed the form, signed it and dated it. *See id.*

As part of this process, Cacciatori specifically informed the sales representative that her own projected weekly income at the time was $900. *See id.* When informed that she could obtain a lower interest rate if she were able to state more income, Cacciatori told the sales representative that her partner, Tania Wilson, who lived in the same household, contributed $2,200 monthly to the household's operation. *See id.* The sales representative then combined Cacciatori's monthly income with what Cacciatori indicated Wilson contributed to the household's operation and listed $5,500[4] as the monthly figure for the "Applicant's Gross Salary." *See id.* at 3/297; *see also* FM ER, Tab IV, at 51:11-22, 54:14-55:13, 66:8-21.

---

[2] With the exception of the trial transcript, pagination herein is cited first by the page number of the particular document cited and second by the page number of the overall FM ER. The trial transcript citations are to the page and line numbers of the transcript itself.

[3] First Mutual did not call the sales representative as a witness, and the only thing the parties could say about the representative was that he was male. *See* FM ER, Tab IX, at 7/301; FM ER, Tab IV, at 78:23-79:6.

[4] Notwithstanding the fact that she projected a $900 weekly "salary," Cacciatori asked the sales representative to reduce the amount of her salary on the form to give her some cushion to account for weeks where she might take in less money. *See* FM ER, Tab IV, at 54:21-25.

In addition, the financing application form contains a separate section for "Other Sources of Income," but there is no explanation on the form for how that section relates to the "Applicant's Gross Salary" section. *See* FM ER, Tab IX, at 3/297; FM ER, Tab V, Exh. A. The sales representative included Ms. Wilson's $2,200 household contribution in this "Other Sources of Income" section as well. *See* FM ER, Tab IX, at 3/297. The sales representative then left blank another section for "Co-Applicant Information." *See id.*

Cacciatori offered to substantiate the information she had provided to the sales representative – concerning her own income projection – by way of bank statements, books of account and 2006 tax returns. *See id.* at 4/298; *see also* FM ER, Tab IV, at 66:25-67:25, 68:9-14. The sales representative declined Cacciatori's offer. *See* FM ER, Tab IX, at 4/298.

As a result, financing was extended to Cacciatori, obligating her to make 144 consecutive monthly payments of principal and interest, each in the amount of $190.79. *See id.* The original principal amount of the loan was $13,886, with an annual percentage rate of 12.99 percent. *See id.*; *see also* FM ER, Tab V, Exh. B. Clearview assigned Cacciatori's contract to Vision Financial Inc. who, one week later, assigned it to First Mutual Bank (First Mutual's predecessor in interest). *See* FM ER, Tab IX, at 4/298; *see also* FM ER, Tab V, Exh. C; FM ER, Tab IV, at 20:9-15, 20:24-21:15.

The Bankruptcy Court determined that First Mutual had not satisfied element 3 of the section 523(a)(2)(B) showing – that the debtor knew at the time her representation was false – because it found that Cacciatori – based upon her "testimony and demeanor as a witness"[5] – believed her representations to be true and because the loan application's "vague and confusing nature" prevented it from concluding that the representations were in fact false. FM ER, Tab IX, at 6/300. As a result, in the Bankruptcy Court's view, Cacciatori did not "know" her representations were false. *See id.*

The Bankruptcy Court also determined that Cacciatori did not recklessly disregard the truth in making her representations, in part because of its determination that the credit application was "a confusing, vague and at certain points self-contradicting document." *See id.* at 7/301-8/302. As part of its reasoning announced at trial, the Bankruptcy Court observed that there was no evidence that First Mutual had given any instruction to sales representatives as to

---

[5] Immediately after the trial, the Bankruptcy Court indicated that it found all the witnesses at trial to have testified credibly. *See* FM ER, Tab IV, at 89:6-9.

how to fill out the application, or its various sections. *See* FM ER, Tab IV, at 91:2-10. As part of its analysis in its written ruling, the Bankruptcy Court also in part noted that the sales representative chose to use the application form in question and to include Wilson's income, meaning that Cacciatori was not reckless in believing that such inclusion was proper. *See* FM ER, Tab IX, at 8/302. As the Bankruptcy Court observed in a related context, Cacciatori could not have "divine[d]" what the eventual lender wanted her to include or not include. *See id.* at 9/303-10/304. The information she had on the issue – the practice reflected by the sales representative – suggested it was proper. *See also* FM ER, Tab IV, at 58:3-7, 90:8-11, 90:21-25.

In addition, the Bankruptcy Court found that element 4 of the section 523(a)(2)(B) showing, concerning intent, was lacking because, again, Cacciatori believed she was making truthful representations. *See* FM ER, Tab IX, at 11/305.

As to the question of reasonable reliance – element 6 of the section 523(a)(2)(B) showing – while the Bankruptcy Court recognized the need for "streamlined and expedited procedures" in making a small-figure loan such as this, the Bankruptcy Court felt First Mutual could have added written, clarifying instructions on the form, and that it could not have reasonably expected Cacciatori to read the lender's corporate mind. *See id.* at 11/305-12/306. Instead, the Bankruptcy Court concluded that the form's confusing, vague, and self-contradictory nature precluded reasonable reliance.

Immediately subsequent to opening statements in the trial, and before the introduction of any evidence, the Bankruptcy Court rejected the parties' proposed stipulated consent judgment, which would have obligated Cacciatori to pay a principal amount of $32,853.87 (for a debt in the original principal amount of $13,886), in $100 minimum monthly amounts, but which would leave Cacciatori denying all of First Mutual's allegations.[6] *See* FM ER, Tab IV, at 13:25-14:6. Despite First Mutual's counsel's offer to adjust the amount owed under the parties' agreement, the Bankruptcy Court rejected a proposed consent judgment twice more during the trial. *See id.* at 41:17-42:4, 72:25-73:4. When it later issued its written decision, the Bankruptcy Court indicated that it had rejected the consent judgment because there "was no reasonable basis for such a settlement based upon a review of the pleadings and the Court's record" and because it felt that it "cannot and should not approve a settlement stipulation in a section 523(a)(2) matter

---

[6] The amount was apparently meant to reflect the amount of a default judgment, along with costs and attorney's fees First Mutual had incurred. *See* FM ER Tab IV, at 32:20-34:7; FM ER Tab V, Exh. 2.

that does not stipulate that fraud has been committed." *See* FM ER, Tab IX, at 12/306-13/307. The Bankruptcy Court justified the first of these two reasons, in part, by way of reference to 11 U.S.C. § 105(a). Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

### Denial of the Proposed Consent Judgment

The Bankruptcy Court did not err in (repeatedly) denying the proposed consent judgment.[7] Even ignoring the fact that the proposed consent judgment would have saddled Cacciatori with a debt that was almost *triple* the amount of the original principal amount owed, the Bankruptcy Court correctly concluded that it was appropriate to reject the consent judgment under its section 105(a) powers. There is no question that a bankruptcy court has the power to reject a proposed stipulation under section 105(a). *See Meyer v. Lenox (In re Lenox)*, 902 F.2d 737, 740 (9th Cir. 1990) (indicating that a bankruptcy court "can even *set aside* a stipulation entirely if the interests of justice so require and if the parties can be restored to the positions they occupied before they entered the stipulation") (emphasis added); *see also Martin v. Kane (In re A&C Props.)*, 784 F.2d 1377, 1380 n.4 (9th Cir. 1986) (noting, in considering whether bankruptcy court appropriately approved compromise, that section 105(a) "allows the court to issue any order, process or judgment necessary or appropriate to carry out the provisions of title 11"); *cf.* March, Ahart, et al., California Practice Guide: Bankruptcy ("March & Ahart") (2010) § 2:19, at 22-210 (noting that, where a reaffirmation agreement has been negotiated with an unrepresented debtor, court approval must be obtained).

Notwithstanding a bankruptcy court's power to reject a proposed stipulation, it still "must locate its equitable authority in the Bankruptcy Code." *Pac. Shores Dev., LLC v. At Home Corp. (In re At Home Corp.)*, 392 F.3d 1064, 1070 (9th Cir. 2004). Here, the basis for the Bankruptcy

---

[7] First Mutual takes the position that an abuse of discretion standard of review applies to the Bankruptcy Court's actual decision to reject the proposed consent judgment, citing *Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377, 1380 (9th Cir. 1986). Even assuming First Mutual is correct (*A&C Properties* actually involved review of a bankruptcy court's decision *approving* the compromise of a controversy), this would not change this Court's analysis of this issue. The Bankruptcy Court neither erred as a matter of law nor as a matter of discretion in its decision to reject the proposed consent judgment.

Court to exercise its section 105(a) equitable authority is section 523's non-dischargeability provisions. "11 U.S.C. § 523 sets out exceptions to the general rule that debts may be discharged in bankruptcy." *Lansford*, 822 F.2d at 904. In other words, Cacciatori's debt was dischargeable unless First Mutual was able to demonstrate that the provision for non-dischargeability provided by section 523(a)(2)(B) applied. The parties asked that the Bankruptcy Court approve a settlement which would have rendered the debt, in effect, non-dischargeable, *without* admitting to the type of wrongdoing section 523(a)(2)(B) contemplates. Far from using section 105(a) to do something inconsistent with the Bankruptcy Code, the Bankruptcy Court acted so as to require compliance with the Bankruptcy Code for purposes of a non-dischargeability judgment (obtained by way of consent or otherwise).[8]

"The Bankruptcy Code 'limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor.'" *Boyajian*, 564 F.3d at 1092 (quoting *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)). Because the proposed consent judgment would have included a *denial* that Cacciatori had actually committed any section 523(a)(2)(B) wrongdoing, what the parties were effectively proposing was that Cacciatori actually *was* an "honest but unfortunate debtor," but that she would *not* be able to take advantage of the "opportunity for a completely unencumbered new beginning." The Bankruptcy Court sensibly rejected such a perverse outcome.[9] *See also* March, Ahart, et al., <u>California Practice Guide: Bankruptcy</u> ("<u>March & Ahart</u>") (2010) §§ 22:8-22:9, at 22-2 (discussing difference between prepetition and postpetition waivers of discharge). There was no error.[10]

---

[8] Apart from the immediate conflict with the Bankruptcy Code's dischargeability provisions this would have engendered, it might have had downstream effects that would have potentially conflicted with the Code as well insofar as it might have made it difficult for a future court to determine whether the underlying conduct was of a type that would make a debt non-dischargeable. *See, e.g.,* <u>Collier on Bankruptcy</u>, ¶ 523.06A, at 523-27 – 28.

[9] The Bankruptcy Court had no obligation to take any evidence before rejecting the consent judgment because it could determine from the proposal's "face" (First Mutual's counsel orally conveyed its terms) that it would not contain a provision demonstrating that Cacciatori had engaged in wrongdoing.

[10] Even if it could be said that the Bankruptcy Court employed the wrong standard, and should have employed the standard originating with the Supreme Court's decision in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968), which involved approval of a compromise in the context of a reorganization plan, it is obvious to this Court that the result would have been the same, in part because that standard leaves more than adequate room for the same type of considerations the Bankruptcy Court actually employed here. *See, e.g., Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 534 (9th Cir. 2011) (indicating that, notwithstanding abuse of discretion within the meaning of *United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) (*en banc*), harmless error analysis applied, at least in connection with decision to exclude evidence at summary judgment stage); ); *In re Siriani*, 967 F.2d 302, 304 (9th Cir. 1992) (noting that bankruptcy court's decision could be

**Dischargeability of the Debt**

The Bankruptcy Court did *not* commit clear error in finding that First Mutual had *not* demonstrated, by a preponderance of the evidence, that elements 3, 4 and 6 of the section 523(a)(2)(B) showing were satisfied. As it observed, Cacciatori certainly had sufficient reason to believe that there was no error in the completion of the financing application form because the person who presented the financing opportunity to her was the one filling out the form. According to Cacciatori's testimony (which the Bankruptcy Court found credible[11]), that person was fully aware that Cacciatori herself could not account for the full $5,500 monthly amount listed on the form. Yet, he chose to include it where he did (in addition to listing Wilson's portion of that amount again as "Other Sources of Income"). Moreover, Cacciatori offered to provide back-up for the income she projected[12] for herself. Clearview's sales representative rejected that offer.

These facts support a finding adverse to First Mutual on these three elements. *See also* March & Ahart, § 22:1694, at 22-183 (quoting and citing Eleventh Circuit and Eighth Circuit decisions for the proposition that evidence is to be viewed consistent with congressional intent that exceptions to discharge are to be construed narrowly against the creditor and liberally against the debtor, effectuating the fresh start policy of the Code); Collier on Bankruptcy (15th

---

affirmed on any ground finding support in the record). The *Protective Committee* standard simply requires a bankruptcy judge to:

> apprise[] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and *all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.*

*Id.* at 424 (emphasis added); *see also* Collier on Bankruptcy (15th ed. rev.) ¶ 9019.02, at 9019-4. Here, the Bankruptcy Court did not need to go far to find a determinative reason for rejecting the proposed consent judgment: it would not have encompassed any admission of wrongdoing within the meaning of section 523(a)(2)(B). Moreover, it had already heard the parties' opening statements concerning the nature of the case and the parties' positions and was therefore familiar with what would be litigated.

[11] First Mutual's late attempt to call Cacciatori's credibility into question in its Reply is both improper and insufficient. There is no demonstrated reason for this Court to question the Bankruptcy Court's credibility finding, a determination for which a trial court is particularly well-suited. *See Wolfe v. Jacobson (In re Jacobson)*, 676 F.3d 1193, __ (9th Cir. 2012) ("When factual findings are based on determinations regarding the credibility of witnesses, [an appellate court] give[s] great deference to [those] findings.") (omitting internal quotation marks) (quoting *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010)).

[12] In *Candland*, the Ninth Circuit noted uncertainty with respect to "[w]hether a lender can rely on a borrower's projections" in the context of section 523(a)(2)(B), a question the court refrained from answering due to the circumstances of that case. *See Candland*, 90 F.3d at 1470.

ed. rev.), ¶ 523.05, at 523-24 – 25. They certainly speak to a lack of intent on Cacciatori's part, even if the necessary knowledge and intent is pegged to a standard of "reckless disregard," *see, e.g., Beneficial Cal., Inc. v. Brown (In re Brown)*, 217 B.R. 857, 863 (Bankr. S.D. Cal. 1998), as the Bankruptcy Court and First Mutual both believe is applicable. *See also* March & Ahart, § 22:570, at 22-68; *id.* § 22:465, at 22-57; Collier on Bankruptcy, ¶ 523.08[2][e][ii], at 523-50 – 51. Indeed, a leading bankruptcy practice guide indicates that "if a debtor was misled by the creditor's agent into signing the statement – as when the creditor's agent fills it out and gives it to the debtor to sign, perhaps even leaving certain blanks unfilled – the element of intention is lacking, and discharge of the debt is not barred." Collier on Bankruptcy, ¶ 523.08[2][e][ii], at 523-51.

Perhaps most prominently for this Court, however, those facts stand as an obstacle to any conclusion that First Mutual's reliance was reasonable. As discussed further, *infra*, Footnote 14, First Mutual is a willing party to a process that relies upon sales representatives of unaffiliated entities to gather and – at least in this instance – complete financing application forms. When those sales representatives are informed of all relevant information concerning the make-up of a salary figure and – presumably because they have not been instructed in compliance with First Mutual's views of how the form operates (certainly there was no evidence to the contrary) – enter that information erroneously on the financing application form, First Mutual has failed to demonstrate that the system is sufficiently reliable that its reliance thereon can be deemed reasonable.

This Court need not conclude that a creditor must engage in some investigation of a borrower's financial status in connection with a "stated income" loan in order to render any reliance reasonable. *Cf. Candland*, 90 F.3d at 1471 (determining that there was "little investigation" required under the circumstances of that case); *Siriani*, 967 F.2d at 307 (concluding that bankruptcy court had not committed clear error in finding creditor had reasonably relied and in reasoning that "[t]he defendant cannot simply rely on minor clues of falsity in a financial statement that on the whole has all the appearance of being very complete and reliable and where the plaintiff takes reasonable steps to inquire as to the creditworthiness of the defendants"); *Lansford*, 822 F.2d at 904 ("We cannot credit Lansford's argument that La Trattoria's reliance on the financial statement was unreasonable because of its failure to verify the information in the financial statement."). Thus, the fact that Cacciatori offered, and the sales

representative refused, backup information concerning Cacciatori's finances, is somewhat irrelevant to this Court's analysis of the reasonable reliance element.

Here, the sales representative *knew* that $2,200 of the monthly figure that was included in the finance application did *not* come from Cacciatori, but from her then-partner. This is not a matter of failing to investigate, but of staring information in the face and, effectively, determining that it did not matter. *See* March & Ahart, § 22:584, at 22-70 (listing factors that are considered in connection with reasonable reliance element, including whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the information was inaccurate) (citing *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1117 (3d Cir. 1995)). First Mutual blames Cacciatori for ignoring what it considers obvious due to her sophistication in largely unrelated matters and fields,[13] all the while discounting the fact that the person whose job it was (at least in part) to fill out these forms for prospective borrowers completely disregarded the source of the monthly income he listed on the form.

In *Lansford*, the Ninth Circuit faulted the borrower, reasoning that a false financial statement had been given in response to a lender's "stated desire to deal with a financially secure buyer." *Lansford*, 822 F.3d at 904. "Having intentionally misled the sellers in an area he knew was important to them, it is unseemly for Lansford now to argue that he should be excused from section 523 because the sellers believed him." *Id.* In contrast with *Lansford*, Cacciatori was upfront with the sales representative. Having been forthright with the sales representative in an area she believed was important to the sales representatives (and upstream financiers), it would be unseemly for First Mutual to argue that Cacciatori should not be excused from section 523(a)(2)(B)'s application because the sales representative indicated, through his or her actions and/or words, that the distinction Cacciatori highlighted for them was of no importance. *Compare Merchants Bank of Cal. v. Oh (In re Oh)*, 278 B.R. 844, 858-60 (Bankr. C.D. Cal. 2002); March & Ahart, § 22:571, at 22-69.

It is true that Cacciatori testified that, in her view, First Mutual's reliance was reasonable. *See* FM ER, Tab IV, at 65:18-20. That, however, is obviously an issue for the factfinder – here, the Bankruptcy Court – to determine. First Mutual obviously recognizes the distinction between what a witness can or cannot admit; its own counsel took the position during the trial that First

---

[13] Notwithstanding her experience as a small business owner, Cacciatori testified that she did not know how contract law and agreements work. *See* FM ER, Tab IV, at 85:23-25.

Mutual's own employee/witness could not determine whether something was or was not "salary," because of his belief that it was an issue of law. *See* FM ER, Tab IV, at 41:3-12.[14]

### Conclusion

The Court would affirm the Bankruptcy Court's final judgment in this adversary proceeding.

---

[14] A similar observation would be made about various witnesses' ruminations on whether or not Clearview's sales representative was or was not First Mutual's agent. First Mutual's sole corporate representative testified that Clearview's sales representative was not its agent, and Cacciatori likewise indicated her belief that he was not First Mutual's agent. *See* FM ER, Tab IV, at 22:2-6, 70:11-14. In any event, there is no need for the Court to determine the legal question of whether some form of agency relationship existed. Agency or not, Cacciatori explained why she understandably felt she had a basis to believe in the sales representative's guidance. *See id.* at 70:15-71:21. Indeed, First Mutual's witness described the "process" as follows:

> The contractor is the point of contact with the customer and they arrange – they make the sales presentation, present their product, make arrangements for financing or cash or whatever is appropriate with that customer and submit it through, in this case an intermediary or broker if you will who sends that application onto [sic] the financing arm which we were at that time.

*See id.* at 21:16-23. As discussed further above, Cacciatori plainly had sufficient reason to believe that the sales representative was completing the financing application form in accordance with the interested parties' normal practice.